Dagmar WILSON, Appellant,

v.

UNITED STATES of America,
Appellee.

Donna ALLEN, Appellant,

v.

UNITED STATES of America,
Appellee.

Russell NIXON, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 19501–19503.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 18, 1966.

Decided Aug. 2, 1966.

---

Mr. David Rein, Washington, D. C., with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for appellants.

Mr. Robert L. Keuch, Attorney, Department of Justice, with whom Asst. Atty. Gen. J. Walter Yeagley, Messrs. David G. Bress, U. S. Atty., and Kevin T. Maroney, Attorney, Department of Justice, were on the brief, for appellee. Messrs. Frank Q. Nebeker and Allan M. Palmer, Asst. U. S. Attys., also entered appearances for appellee.

Mr. Gregory Hankin, Washington, D. C., filed a brief on behalf of Women Strike for Peace as amicus curiae, urging reversal.

Mr. Oliver Ellis Stone, Washington, D. C., filed a brief on behalf of Women's International League for Peace and Freedom (WILPF), et al., as amici curiae.

Mrs. Selma W. Samols, Washington, D. C., entered an appearance for National Committee to Abolish the House Un-American Activities Committee, as amicus curiae.

Before MR. JUSTICE REED, Retired*, and DANAHER and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

These are consolidated appeals from convictions, under 2 U.S.C. § 192, for contempt of Congress for refusing to answer any questions at an executive session conducted by a Subcommittee of the House Committee on Un-American Activities on December 7, 1964. The Subcommittee sought to question appellants about their activities in connection with a campaign to persuade the State Department to grant a visa to a Japanese professor for the purpose of fulfilling speaking engagements in the United States. Appellants stated that they would answer questions at a public hearing, but refused to give any testimony at closed sessions.[1]

We find it unnecessary to consider most of the contentions pressed by appellants.[2] In our view the convictions must be reversed because the decision by the Committee to cite appellants for contempt was not given the additional consideration within the legislative branch that is contemplated by the governing statute, 2 U.S.C. § 194.

The statute provides:

§ 194. *Certification of failure to testify; grand jury action.*

Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House, or any joint committee estab-

---

\* Sitting by designation pursuant to Section 294(a), Title 28, U.S.Code.

1. Appellant Nixon refused to be sworn in executive session. Appellants Allen and Wilson agreed to be sworn, or take an affirmation of the oath, but refused to answer any questions in executive session.

  Prior to the hearing appellants' counsel requested that the hearing be canceled on the ground that an inquiry into appellants' visit to the State Department was violative of the First Amendment's protection of the right of citizens to petition the Government and to hear differing points of view.

2. Appellants contend that the subject matter of the investigation was beyond the Committee's jurisdiction; that the Committee's charter, as construed by it, is unconstitutionally vague; that the summoning of appellants was in violation of their First Amendment rights; that the Subcommittee's decision to hold executive hearings was unauthorized; and that the indictments were defective for failure to allege a sufficiently clear and precise subject under inquiry.

lished by a joint or concurrent resolution of the two Houses of Congress, or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session, or when Congress is not in session, a statement of fact constituting such failure is reported to and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States Attorney, whose duty it shall be to bring the matter before the grand jury for its action.

On December 7, 1964, when appellants refused to testify in executive session, Congress was not in session. On December 10, 1964, the full committee, in accordance with the reporting provisions of 2 U.S.C. § 194, transmitted to the Speaker a statement of facts with respect to each of the alleged contempts. The Speaker then certified these statements to the United States Attorney.

Upon the return of the House the Speaker informed the House that he had transmitted the statements "pursuant to the mandatory provisions" of 2 U.S.C. § 194. 111 CONG.REC. 24 (daily ed. Jan. 4, 1965). Apparently the Speaker's action was taken after consulting the House Parliamentarian, who advised that the Speaker had no discretion in the matter and that certification to the prosecutor was mandatory regardless of the Speaker's own private or official judgment on the question. See 111 CONG.REC. A592 (daily ed. Jan. 4, 1965).

■ The Government prosecutor stipulated at the trial that the Speaker understood the statute to make it mandatory upon him to certify the statements to the United States Attorney, and to leave him without any judgment or discretion in the premises. We think the Speaker erred in construing the statute to prohibit any inquiry by him, and that his automatic certification, under a disclaimer denying his jurisdiction to make any inquiry or take any different course, was invalid.

■ At the outset it may be observed that our consideration of the validity of the Speaker's certification in this case is required in the exercise of our judicial function and is in no sense an invasion of the prerogatives of Congress. We are not reviewing an exercise of discretion by a public officer, but rather determining whether the governing statute allows or requires that discretion be exercised. Compare United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). "The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function." United States v. American Trucking Ass'ns, 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). That the statute involved is one pertaining to the conduct of the affairs of Congress does not remove its interpretation from the province of the courts. This conclusion follows *a fortiori* from United States v. Smith, 286 U.S. 6, 52 S.Ct. 475, 76 L.Ed. 954 (1932), where the Supreme Court unanimously reversed a construction given by the Senate to one of its own rules, stating that "[a]s the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one." 286 U.S. at 33, 52 S.Ct. at 478. There is, of course, a presumption that acts of public officers are taken in accordance with applicable statutes. But that presumption of regularity may be overcome, *e. g.*, by a showing that the acts were based on a misinterpretation of statutory law or in violation of prescribed procedures. Stearns Co. v. United States, 291 U.S. 54, 63, 54 S.Ct. 325, 78 L.Ed. 647 (1934); United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); Martin v. Mott, 25 U.S. (12 Wheat.) 19, 32, 6 L.Ed. 537 (1827).

■ The Government urges that we accept a literal reading of 2 U.S.C. § 194 to require automatic certification of the committee's statement of facts by the Speaker. The literal meaning of a statute cannot be followed where it leads to a result contrary to legislative intention as revealed by the legislative history or other appropriate sources. United States v. American Trucking Ass'ns, 310 U.S. 534, 542–543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). That is the situation in the case before us.

We may appropriately begin our discussion by considering the duty of the Speaker when the House is in session, because that has been the scope of the statute for the bulk of its life. The words of present 2 U.S.C. § 194 are just as mandatory on the Speaker when the House is in session as when it is not in session. Yet the practice of Congress since 1857, when R.S. § 104, the statutory predecessor of 2 U.S.C. § 194, was enacted, has been uniformly to the contrary. And this practice is in accordance with judicial construction.

■ It has been the consistent legislative course that the Speaker is not under a "mandatory" duty to certify the report of the committee, but on the contrary that the committee's report is subject to further consideration on the merits by the House involved. When the House is in session the Speaker does not automatically transmit the report of alleged contempt to the United States Attorney. Instead as a matter of routine a member of the committee offers a resolution for the consideration of the House involved. See generally BECK, CONTEMPT OF CONGRESS 195–240 (1959) collecting instances of contempt citations since 1857, and demonstrating beyond any doubt that the House and the Senate have consistently considered, and occasionally debated at length, resolutions authorizing the Speaker of the House or the President pro tempore of the Senate to certify under the statute. Votes have often been cast against such resolutions.

Recent House debate and voting on resolutions to certify contempt citations of KU KLUX KLAN officials for refusing to answer questions put them by the House Committee on Un-American Activities are instructive in this regard. See 112 CONG.REC. 1657–1730 (daily ed. Feb. 2, 1966). A resolution to recommit the contempt resolutions to a select committee "to examine the sufficiency of the contempt citations under existing rules of law and relevant judicial decisions" was considered at some length and defeated, 307–357. *Id.* at 1694. It was clear throughout the debate that the members of the House believed they were exercising an appropriate and necessary function in reviewing the Committee's determination that the witnesses were in contempt. See, *e. g.*, remarks of Representative Mathias the following day: "We [the entire House] met yesterday as committing magistrates." 112 CONG.REC. 1993 (daily ed. Feb. 3, 1966).[3]

Since the act of one house cannot repeal a statute passed by both, it follows that this long-standing practice reflects the understanding of members of both the House and the Senate that 2 U.S.C. § 194 is mandatory on the Speaker or President pro tempore only in form, not in substance and fact, and that the committee involved is subject to an appropriate legislative surveillance on the merits of contempt citations. The House Committee on Un-American Activities itself has recognized that House resolutions to direct certification of contempt citations are a part of the current procedure.[4]

---

3. For other notable instances of lengthy debate and strong opposition to contempt resolutions in the House, see 106 CONG. REC. 17278–17316 (1966) (citing officials of the New York Port Authority for contempt); 96 CONG.REC. 13881–13893 (1950) (citing Edward Rumely for contempt).

4. House Committee on Un-American Activities Annual Report, 1956, p. 57; Annual Report, 1955, p. 36.

Construction of 2 U.S.C. § 194 as not requiring automatic certification by the presiding officer finds support in the 1924 debates in the Senate on the Sinclair case. Although the President pro tempore of the Senate commented that he viewed the statutory procedure as an automatic one, and saw no need for such a resolution (65 CONG.REC. 4790), it is fair to conclude that this was not the sense of the Senate as a whole. Senator Walsh, author of the resolution, stated (65 CONG.REC. 4725):

It will be observed that the first thing is that the witness must have failed to testify. I imagine that some one must decide whether or not he has failed to testify. The committee has reported that he has so failed, but I suppose the Senate must first decide whether, as a matter of fact, the witness has failed to testify, and if the Senate decides that he has failed to testify, then it automatically becomes the duty of the President of the Senate to report that fact.

Senator Brandegee (65 CONG.REC. 4726), referring to the duty of the President to certify, stated:

The statute does not say that he must do it immediately. Of course there is time for consideration as to the proper course to pursue.

Finally, Senator George stated, 65 CONG.REC. 4726, that in certifying the facts of the contempt—

it necessarily follows that either the President of the Senate or the Senate itself must determine to be true what the committee has found prima facie, namely, that it has propounded a pertinent question and the witness has refused to answer that pertinent inquiry.

Senator George's interpretation of the statute is referred to with approval, as providing the predicate for a certification resolution, in a 1954 study prepared for the Senate Judiciary Committee by the Legislative Reference Service.[5]

If the Government's argument is correct, it would follow that the long course of preparation and voting on contempt resolutions represents time-consuming but meaningless gestures on the part of a long string of Congresses. We do not accept that view of the matter. It is clear that where the alleged contempts are committed while Congress was in session, the Speaker may not certify to the United States Attorney the statements of fact prepared by the Committee until the report of alleged contempt has been acted upon by the House as a whole.

Although we have considered the matter afresh in the light of Congressional practice it may be appropriate to note that our view that the statute is not automatic is in accord with earlier judicial rulings. The Supreme Court made it clear at an early date that the mandatory language of the statute, though passed by both houses, cannot be followed if a contempt resolution is defeated by the house whose committee initiated the contempt action; the Speaker or President pro tempore may not certify the statement of facts to the United States Attorney in such instance. In re Chapman, 166 U.S. 661, 667, 17 S.Ct. 677, 41 L.Ed. 1154 (1897). And notwithstanding the language of 2 U.S.C. § 194, Judge Augustus Hand, in a 1952 opinion, referred to the resolution of the Senate citing defendant for contempt as "required by 2 U.S.C. § 194." United States v. Costello, 198 F.2d 200, 204–205 (2d Cir.), cert. denied, 344 U.S. 874, 73 S.Ct. 166, 97 L.Ed. 677 (1952).

The Supreme Court pronouncement that the Speaker could be put under a disability to certify by the action of a particular house plainly destroys any premise that the statute imposed upon the Speaker an automatic duty to certify, for a duty imposed by statute manifestly could not be suspended or set aside by the action of a single house. Hence it is plain that the wording "it shall be the duty of the * * * Speaker * * *

5. "Congressional Power of Investigation," S.Doc.No. 99, 83d Cong., 2d Sess., p. 30 (1954).

to certify" does not mean that the action of the full committee imposes on the Speaker an automatic duty to certify.

The Government tries to avoid the foregoing interpretation—settled both by the Supreme Court's opinion in *Chapman,* and by long and consistent legislative construction—by advancing an alternative argument. The contention is that even if the statute is construed to require House or Senate consideration when Congress is in session, all that is contemplated when Congress is not in session is action by the committee and automatic certification without any further legislative consideration. There is *no basis in legal theory or reason to support the bizarre result of assigning two such radically different readings to the single statutory phrase*—as generally requiring but sometimes prohibiting, further consideration within the particular house.

The Government's interpretation would enable committees, by scheduling hearings when Congress is not in session, or recalling witnesses at that time, or perhaps merely by postponing reports on allegedly contemptuous conduct until after adjournment, effectively to insulate their actions on contempt matters from any further consideration within the legislative branch. This consequence demonstrates the infirmity of the interpretation proposed by the Government. And the legislative history of the 1936 amendment to 2 U.S.C. § 194, to which we now turn, makes it clear that no such anomalous result was intended.

■ The clause providing for report and certification when Congress is not in session was added to the statute in 1936. Its general purpose, as revealed by the House and Senate Reports, was to prevent undue delays in punishing contempts. We see no basis for supposing that in enacting the 1936 amendment Congress intended to cast aside the principle of legislative reconsideration which it had developed and applied over the years. It made no change in language which would support an inference of change in intention. The pertinent legislative history is brief, but such as it is it cuts against the Government's contention. Both Committee Reports state that "the requirement that the statement of facts first be filed with the President of the Senate or the Speaker of the House constitutes a check against hasty action on the part of a committee." H.R.REP.No. 1667, 74th Cong., 1st Sess., p. 2 (1935); S.REP.No. 2037, 74th Cong., 2d Sess., p. 2 (1936). But there would be no check on the committee —indeed it would be given a blank check—if the mere filing of the committee's report made it mandatory for the Speaker or the President pro tempore to certify the committee's statement of facts to the United States Attorney without any examination.

The 1936 amendment must be read in the context of the current and time-honored practice, since 1857, under which a "check" on hasty action by a committee is provided through House or Senate consideration of a resolution authorizing the presiding officer to make the certification set forth in the statute. The Congressional practice reflects a conclusion that it is inherently unfair to permit the allegedly insulted committee to provide the sole legislative determination whether to initiate proceedings to prosecute for contempt. See 106 CONG.REC. 17322 (1960) (remarks of Rep. Thomas Curtis). The broad immunity of Congressmen from questioning outside of Congress for actions taken with respect to contempt citations, see United States v. Johnson, 383 U.S. 169, 179–180, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), underscores doubt that Congress in enacting the 1936 amendment intended to withdraw even a minimal opportunity for reflection within the legislative branch concerning a committee's contempt citation.

The correct interpretation gives meaning to the 1936 report of the Judiciary Committee in the context of the legislative practice, which prevailed both then and now, for contempts reported while Congress is in session. The correct interpretation is that 2 U.S.C. § 194 vests

jurisdiction in the Speaker of the House and the President pro tempore of the Senate, when Congress is not in session, to provide a substitute for the kind of consideration which would be provided by the house involved if it were still in session.

In most cases, doubtless, he would conclude that the statement should be transmitted forthwith. The 1936 amendment achieves the substantial purpose of avoiding unnecessary delay in prosecuting those cases. But prosecution would not be begun without the additional scrutiny within the legislative branch, a scrutiny that would at least embrace examining the sufficiency of the statement of facts of alleged contempts, and consideration whether the incident constitutes the kind of wilful contumacy contemplated by the statute, or perhaps whether the matter is sufficiently dubious so that no contempt action should be begun in the absence of approval by the entire house.

This construction of the statute does not contemplate an empty ceremony. The facts of the cases at bar provide an example of the kind of case in which Congress may well have felt, in enacting 2 U.S.C. § 194, that some sort of "check" on action by a committee in instituting contempt prosecutions is appropriate.

The witnesses here did not refuse to testify absolutely. They were willing to testify at a public hearing. House Rule XI–26(g) and 2 U.S.C. § 190a(f) [6] establish that public hearings are the general rule. Of course, it is up to the committee, not the witness, to decide whether hearings should be open or executive. But here the witnesses urged that executive session was inappropriate unless there was a danger to national security posed by public hearings. Representative Pool, as chairman, advised the appellants that their requests were denied, and that reasons of national security are not the only ones that permit or justify executive hearings. Appellants' attention was called to Rule 26 (m),[7] which contemplates executive sessions where an interrogation may tend to "incriminate, degrade or defame other persons." Appellants claimed both that they had nothing incriminating to say about others and stressed that their own reputations were imperiled if they were called to testify without their explanations being made public. It may be noted that in 1960 the Internal Security Subcommittee of the Senate Judiciary Committee, in an investigation of a campaign against nuclear testing, granted the request of Dr. Linus Pauling for a public hearing in place of the executive session previously scheduled. *Hearings Before the Subcommittee on Internal Security of the Senate Committee on the Judiciary,* 86th Cong., 2d Sess., p. 367 (1960). We are not intimating any view as to the need and appropriateness of executive or public sessions. What we do hold is that there should have been an opportunity for consideration of the issues following the Committee's action and prior to certification—consideration by the Speaker, as the cognizant officer of the House, in view of the unavailability after adjournment of the normal consideration by the

---

6. The House Rule and 2 U.S.C. § 190a (f) provide:

All hearings conducted by standing committees or their subcommittees shall be open to the public, except executive sessions for marking up bills or for voting or where the committee by a majority vote orders an executive session.

The Brookings Institution, in a 1945 report to the House Committee on Un-American Activities, recommended that witnesses have a right to testify in open hearings.

7. Rule 26(m) provides:

If the Committee determines that evidence or testimony at an investigative hearing may tend to defame, degrade, or incriminate any person it shall (1) receive such evidence or testimony in executive session; (2) afford such person an opportunity voluntarily to appear as a witness; and (3) receive and dispose of requests from such persons to subpoena additional witnesses.

House itself. In our view 2 U.S.C. § 194 provides a procedure for, and requires, such consideration.

Since the Speaker of the House disclaimed jurisdiction to provide such consideration, under the erroneous view that he had no choice but to forward the Committee's report automatically, his certifications, and the subsequent prosecutions and convictions, can not stand.

Reversed.

DANAHER, Circuit Judge (dissenting):

Basically the question for us is whether or not, as a matter of law, we are bound to strike down an official act of the Speaker of the House of Representatives, taken by him in reliance upon the language of 2 U.S.C. § 194 (1964). In my view, the Speaker under circumstances to be mentioned, had not acted illegally.

These three appellants were found guilty of violation of 2 U.S.C. § 192 (1964), after having waived a jury trial and after the respective indictments had been consolidated with consent of the parties. In substance one indictment charged that Nixon had refused to be sworn before a duly authorized Subcommittee of the Committee on Un-American Activities of the House of Representatives.[1]

Appellant Wilson, according to the indictment, was confronted with the following statement and question:

"Mrs. Wilson, this committee has received testimony to the effect that on Friday, November 8, 1963, you accompanied Mr. Russell Nixon on a visit to the Department of State on behalf of Dr. Kaouri Yasui. Did you accompany Mr. Nixon as I have stated?"

Mrs. Wilson refused to answer that question and, as charged in a second count, refused to answer any questions to be asked of her by counsel and by the Subcommittee.

The indictment of appellant Allen set out that she was asked to state her name and residence, refused to answer when queried, and refused to answer any questions to be asked of her by counsel and by the Subcommittee.

Each indictment recited in its first four paragraphs that within the scope of the authority of the Committee was its duty to inquire into:

(1) the strategy, tactics and activities of members of the Communist Party and Communist organizations in aiding the entry into the United States of aliens inadmissible under the provisions of the Immigration and Nationality Act;

(2) the security aspects of the temporary admission to the United States of aliens who are admissible under the provisions of the Immigration and Nationality Act for the legislative purpose of determining whether the exigencies of the situation require a strengthening of the security provisions of that Act;

(3) the execution by administrative agencies concerned of the security provisions of the Immigration and Nationality Act, and

(4) related matters.

Unlike the situation presented in the *Gojack* case, the Subcommittee's authority is here seen to be clear and to have been conferred in accordance with law.

When the appellants sought dismissal of the indictment, the judge noted that the appellants had conceded that paragraph 1 of the indictment, *supra*, was within the jurisdiction of the Committee, and in denying their motion to dismiss,

---

1. The Committee is a standing committee of the House authorized to make investigations of Un-American and subversive "propaganda" and "propaganda activities" and "all other questions in relation thereto that would aid Congress in any necessary remedial legislation." Gojack v. United States, 384 U.S. 702, 86 S.Ct. 1689, 16 L.Ed.2d 870 (1966); cf. Wilkinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961).

the court held, relying upon Barenblatt v. United States [2] that the subject matter of paragraphs 2 and 3, *supra,* likewise came within the Committee's jurisdiction.

At trial it became evident that the refusal of the respective appellants to testify stemmed primarily from their insistence that they be examined in open hearings rather than in executive Subcommittee sessions. We need not presently pause to inquire into the Subcommittee's power to conduct its hearings in executive session (although that power seems clearly to have been established in the circumstances of this case),[3] for we may turn presently to what we deem to be the basic issue which must here be resolved.

So it was, even as the Subcommittee decided upon an executive session, the appellants were insisting upon open hearings. The Subcommittee in furtherance of its legislative purpose undertook to ascertain whether the appellants, thus sought an official forum for publicizing their own views or for exploitation of propaganda in furtherance of Soviet aims; whether existing laws were adequate to bar the entry of certain types of aliens otherwise inadmissible to the United States or an improper waiver had been granted to Yasui; or whether the Immigration and Nationality Act failed to reflect congressional intent in any such respects. Faced with the refusal of the appellants to testify, the Subcommittee brought the matter to the attention of the full Committee.

Chairman Pool reported that these appellants had refused to testify before the Subcommittee in executive session on December 7 when the Subcommittee had proposed to conduct hearings pursuant to the resolution adopted by the Committee on February 19, 1964. The Subcommittee further reported that all of its members had agreed that a report of the facts relating to the refusal of each of these appellants to testify be referred and submitted to the Committee on Un-American Activities as a whole with a recommendation that a report and statement of fact with reference to each such refusal be made to and filed with the Speaker of the House, not then in session, in order that the Speaker might certify the same under the seal of the House to the United States Attorney that each of the appellants may be proceeded against for contempt of the House of Representatives.

The Subcommittee's report was approved and adopted by the full Committee which Committee authorized and directed its chairman to forward the report and statement of fact to the Speaker. Similar action was taken separately as to each of the appellants.

2. 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

3. The 88th Congress adopted its Rules by House Resolution No. 5, January 9, 1963.
   Rule XI deals with "Powers and Duties of Committees."
   Paragraph 26(g) provides that all hearings conducted by standing committees or their subcommittees "shall be open to the public except * * * where the committee by a majority vote orders an executive session."
   Rule 26(a) provides that " * * * Committees may adopt additional rules not inconsistent herewith," pursuant to which the House Committee on Un-American Activities had adopted as a rule of procedure that each subcommittee was authorized to determine by majority vote whether hearings "shall be open to the public or shall be in executive session."

Moreover Rule XI, paragraph 26(m) provides in pertinent part that "if the committee determines that evidence or testimony at an investigative hearing may tend to defame, degrade or incriminate any person, it shall—
"(1) receive such evidence or testimony in executive sessions."
These appellants were informed by the Committee that pursuant to the foregoing rules it had determined to conduct its investigative hearing in executive session. Neither the appellants nor their counsel then voiced objection on the ground that the Committee had not itself made the determination that the hearing be conducted in executive session. Cf. United States v. Bryan, 339 U.S. 323, 332–333, 70 S.Ct. 724, 94 L.Ed. 884 (1950).
See generally, United States v. Orman, 207 F.2d 148, 158–159 (3 Cir. 1953).

The appellants, irrespective of their other claims, have contended that the alleged contempts had been improperly certified to the United States Attorney. Our inquiry involves the proper interpretation of 2 U.S.C. § 194 (1964) which in pertinent part provides:

"Whenever a witness summoned as mentioned in section 192 * * * fails * * * or * * * refuses to answer any question pertinent to the subject under inquiry before either House * * * or any committee or subcommittee of either House of Congress [and] *when Congress is not in session*, a statement of fact constituting such failure is reported to and filed with * * * the Speaker of the House, *it shall be the duty of the * * * Speaker* of the House * * * *to certify, and he shall so certify*, the statement of facts aforesaid under the seal of the * * * House * * * to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action." (Emphasis added.)

As a matter of background, counsel for appellants Wilson and Allen had asked the Committee for a public hearing for his clients. Appellant Nixon joined appellants Wilson and Allen in objecting to an executive session. The Subcommittee determined thereafter that an executive session was desirable

"for reasons of national interest, because of the area of Government operations involved, but which could not be disclosed to the witnesses at this time in any detail without violating

that interest. It was also determined that Rule XI, 26(m) precluded a public hearing at this stage of the investigation because the proposed area of interrogation would involve persons, other than the witnesses, in a defamatory or possibly incriminating manner forbidden by the rule." [4]

The Speaker on December 11, 1964 certified the facts to the United States Attorney, and on January 4, 1965 announced to the House of Representatives:

"The SPEAKER. The Chair desires to announce that subsequent to the sine die adjournment of the 88th Congress, the Committee on Un-American Activities reported to and filed with the Speaker statements of fact concerning the refusal of Russell Nixon, Dagmar Wilson, and Donna Allen to testify before a duly constituted subcommittee of the Committee on Un-American Activities of the House of Representatives, and that he did, on December 11, 1964, pursuant to the mandatory provisions of Public Resolution 123, 75th Congress, certify to the U.S. attorney for the District of Columbia, the statement of facts concerning the said Russell Nixon, Dagmar Wilson, and Donna Allen." [5]

The language of the statute is mandatory on its face. It is clear on its face. There is no ambiguity about it. It is fundamental that the words of statutes are to be interpreted wherever possible "in their ordinary, everyday senses." [6] The Speaker believed he was bound to act as the statute directs—and I believe he was.

---

4. Extract from minutes of Subcommittee meeting.

The Committee had been informed that the three appellants had collaborated in furthering the entry into this country of a Japanese professor named Yasui, allegedly an important factor in a major Soviet-controlled movement with interests favoring a Soviet propaganda position and hostile to the United States and its international interests. The Department of State had denied Yasui's request for a visa only

to reverse itself after activity on the part of the appellants to the end that Yasui might undertake a lecture tour in the United States, as he thereafter did.

5. CONG.REC. 89th Cong., 1st Sess. p. 24 (Jan. 4, 1965).

6. Crane v. Commissioner, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966).

Not only was the amendment in 1936, 49 STAT. 2041, designed [7] to reach the contumacy shown in a refusal or failure to testify wherever an authorized committee encountered such contempt, it was further an objective of the challenged language that immediate action could be taken that the committees of Congress not be thwarted in their effort to effectuate a congressional purpose.

With great deference to the position of my colleagues, it seems to me that the interpretation they have adopted will completely nullify the result the Congress sought to achieve. The 1936 amendment is being rendered nugatory. References to what may be or may have been the practice of the Congress *when in session* seem to me to be totally irrelevant to our problem.

Thus, first, the Committee, then the Speaker, and finally, the appropriate United States Attorney and the grand jury were commanded to act. A grand jury, of course, may refuse to act on facts presented to it, and often has refused to indict. The 89th Congress undoubtedly could have resolved to recall the citation, for it could not have been bound by an action of the Speaker taken pursuant to the directive of a committee created under the rules of the 88th Congress. And in due course, there

is always the protection of the trial itself, with a right of appeal. It may be doubted that the congressional scheme could be more completely spelled out.

I would affirm.

---

7.  Congress was urged to adopt the amendment to meet the "demonstrated need" to avoid a delay of months in prosecution, and to reach a contumacious witness at hearings held outside of Washington. The Committee report explained: "If Congress is not in session when the failure to testify occurs * * * a statement of facts constituting such failure is to be reported and filed by the Committee with the * * * Speaker of the House * * * whose duty it then shall be to certify the statement of facts * * * to the appropriate United States Attorney, whose duty it then is to bring the matter to the attention of the proper grand jury." And further: "The requirement that the statement of facts first be filed with the * * *

Speaker of the House constitutes a check against hasty action on the part of the Committee." See H.R.REP.No. 1567, 74th Cong., 1st Sess., to accompany H.R. 8875, 49 STAT. 2041 (1936). "Shall" is a word of command. Thus, when Congress was not in session, it became the duty of the Speaker to certify the statement to the appropriate United States Attorney, just as it became the duty of the latter to present the matter to the grand jury. If we really were called upon to look beyond the statute for the intent of Congress, we should scrutinize, not floor debates and speeches for the record, but the reports of the committees in charge of the legislation. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474, 41 S.Ct. 172, 65 L.Ed. 349 (1921).