**Harold WILSON, Plaintiff-Appellant,**

v.

**Donald P. HODEL, Secretary of the Interior, et al., Defendants-Appellees.**

No. 83–2479.

United States Court of Appeals,
Tenth Circuit.

April 2, 1985.

Alan L. Sullivan, Salt Lake City, Utah (Phillip Wm. Lear and Douglas L. Davies, Salt Lake City, Utah, with him on brief) of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiff-appellant.

Ellen J. Durkee, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., and Jacques B. Gelin, Dept. of Justice, Washington, D.C.; and Brent D. Ward, U.S. Atty. and Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, with her on brief), Dept. of Justice, Washington, D.C., for defendants-appellees.

Before BARRETT and McKAY, Circuit Judges, and ELLISON,* District Judge.

BARRETT, Circuit Judge.

This appeal concerns the application of the presumption of administrative regularity as it relates to the filing by potential lessees of requisite information in the Department of Interior's noncompetitive oil and gas leasing program. Both the Interior Board of Land Appeals (IBLA) and the district court concluded that Harold Wilson had not rebutted the presumption by establishing clear proof that he had submitted all of the information necessary for the issuance of an oil and gas lease. Wilson appeals from the district court's decision upholding IBLA's application of the presumption.

Since 1959 the Department of Interior has issued noncompetitive oil and gas leases on public lands by means of a drawing.

---

* The Honorable James O. Ellison, United States District Judge for the Northern District of Oklahoma, sitting by designation.

Any person interested in obtaining a lease makes an "offer" to the proper Bureau of Land Management (BLM) office by submitting a drawing entry card (DEC). The offeror whose card is drawn first, assuming the requisite qualifications otherwise have been met, is the first person eligible to be issued the lease. If the card is defective or the requisite qualifications have not been met, BLM considers the entry card drawn second, and then considers the entry card drawn third. *See Brick v. Andrus,* 628 F.2d 213, 214 (D.C.Cir.1980).

When Wilson submitted his offer, 43 C.F.R. 3102.6–1(a) (1979)[1] provided the qualifications that had to be complied with as prerequisites to the issuance of an oil and gas lease. In general, that regulation required that when a DEC was signed on behalf of an offeror by an agent, the agency relationship had to be disclosed and both the offeror and agent had to submit separate statements detailing any agreement between them by which the agent might receive any interest in the lease in the event it issued.

In the January, 1980, drawing at the Utah BLM office, Wilson's drawing entry card for Parcel UT–35 was drawn first. The card was signed on Wilson's behalf by the Federal Lease Filing Corporation (FLFC), a private corporation.

Wilson was not immediately notified that his card had been first chosen, however, because on February 29, 1980, the Secretary of Interior suspended processing of all pending oil and gas lease offers. The purpose of the suspension was to facilitate the investigation of allegations of fraud in the noncompetitive leasing system. *See* Order No. 3049, published in 45 Fed.Reg. 30553–30554 (May 8, 1980). In April, 1980, the lease issuance process was resumed with qualifications. *Id.*

Under the new procedure outlined in Instruction Memorandum No. 80–492 (May 1, 1980), which was sent to state BLM directors but not published in the Federal Register, state BLM offices were to begin producing copies of files of pending lease applications. These copied files were then to be transmitted to the United States Attorney's Office for the District of Colorado in Denver, which was coordinating the fraud investigation. The Instruction Memorandum also required applicants of pending lease applications to complete and submit an additional certification relating to their qualifications to hold federal oil and gas leases. In a letter to Wilson from the Utah BLM office dated June 27, 1980, Wilson was notified of the fraud investigation being conducted in Denver, as well as the requirement that he complete the enclosed certification form. (R. Vol. II.) In a letter dated July 5, 1980, Wilson enclosed a completed certification, noting he had been informed that he was required to complete it under the terms of the Instruction Memorandum. *Id.*

On January 23, 1981, the Utah BLM office wrote to Wilson requesting that he

---

1. 43 C.F.R. 3102.6–1(a) (1979) then provided, in relevant part:

 (a) Evidence required. (1) Except in the case where a member of a partnership signs an offer on behalf of an association (as to which, see § 3102.3–1), or where an officer of a corporation signs an offer on behalf of the corporation (as to which, see § 3102.4–1), evidence of the authority of the attorney-in-fact or agent to sign the offer and lease, if the offer is signed by such attorney or agent on behalf of the offeror. Where such evidence has previously been filed in the same proper office where the offer is filed, a reference to the serial number of the record in which it has been filed, together with a statement by the attorney-in-fact or agent that such authority is still in effect, will be accepted.

 (2) If the offer is signed by an attorney-in-fact or agent, it shall be accompanied by separate statements over the signatures of the attorney-in-fact or agent and the offeror stating whether or not there is any agreement or understanding between them or with any other person, either oral or written, by which the attorney-in-fact or agent or such other person has received or is to receive any interest in the lease when issued, including royalty interest or interest in any operating agreement under the lease, giving full details of the agreement or understanding if it is a verbal one. The statement must be accompanied by a copy of any such written agreement or understanding.

submit copies of any service agreements and any other documents concerning his relationship with FLFC. (R.Supp. Vol. I at 25.) Wilson responded with a letter dated January 30, 1981, in which he enclosed the requested information but maintained that he previously had submitted the same information. (R.Vol. II.) BLM responded on February 24, 1981, denying that the requested information had ever been received. *Id.* Thereafter, in a decision dated August 4, 1981, BLM rejected Wilson's lease offer on the ground that he had not originally submitted the information necessary under 43 C.F.R. 3102.6–1(a) relative to his relationship with FLFC.

On appeal to the IBLA, Wilson argued that the requisite information had originally been submitted and that, if the Utah BLM office did not have the information, that office had either lost or misplaced it. In support of this contention, Wilson submitted the affidavit of David Kane, Chairman of FLFC. (R.Supp.Vol. I at 1.) In his affidavit, Kane described FLFC's ordinary business procedures in preparing and transmitting its clients' offers to BLM; he stated that these procedures had been followed in processing Wilson's offer. Relying on its recent decision in *John Walter Starks,* 55 IBLA 266 (1981), which it found to be controlling, the IBLA affirmed BLM's decision on the grounds that the Kane affidavit was not sufficient proof that the requisite information had actually been submitted. *Harold E. Wilson,* 67 IBLA 21, 23 (1982). The IBLA concluded that BLM's letter of January 23, 1981, requesting the 43 C.F.R. 3102.6–1(a) information "implie[d] presumptively" that BLM had not originally received the information. *Id.* IBLA found the presumption of administrative regularity therefore applicable, and concluded that 43 C.F.R. 3102.6–1 had not been satisfied. *Id.* Wilson appealed IBLA's decision. The district court affirmed IBLA's decision on cross-motions for summary judgment.

On appeal, Wilson argues that the presumption of administrative regularity does not apply to the facts of this case, and, alternatively, that if the presumption does apply, sufficient proof was submitted to rebut the presumption.

### DISCUSSION

 As a preliminary matter, we note that our scope of review is limited to an examination of the administrative record to determine whether Interior's decision was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law. 5 U.S.C. § 706(2)(A); *Ballard E. Spencer Trust, Inc. v. Morton,* 544 F.2d 1067, 1069 (10th Cir.1976). Furthermore, unless it is shown that BLM deviated from its established procedures in processing Wilson's lease application, *Wilson v. United States,* 369 F.2d 198, 200 (D.C.Cir.1966), BLM's official acts in processing his application are supported by a presumption of administrative regularity. *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). If the presumption applies, we will presume BLM properly discharged its official duties in processing Wilson's offer absent clear evidence to the contrary. *Id.*

Because the presumption of administrative regularity applies only when an agency engages in "regular" activities, Wilson contends that it does not apply to the processing of his offer due to BLM's transmittal of his file to Denver in connection with the fraud investigation. Wilson argues that the transmittal of the file to Denver was a procedure "irregular" on its face.

 We agree that the presumption of regularity does not apply when an agency deviates from its established procedure. However, it is unnecessary to reach Wilson's contention in this regard because it was never presented by Wilson to the IBLA. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." *United States v. L.C. Tucker Truck Lines,* 344 U.S. 33, 37, 73

S.Ct. 67, 69, 97 L.Ed. 54 (1952); *see also Federal Power Commission v. Colorado Interstate Gas*, 348 U.S. 492, 498–499, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955). "A reviewing court usurps the agency's function when it sets aside the administrative determination on a ground not theretofore presented ...." *Unemployment Compensation Commission of Territory of Alaska v. Aragan*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946). Thus, absent exceptional circumstances, a reviewing court will not consider contentions which were not pressed upon the administrative agency. *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1940).

Wilson has not suggested to this court, nor do we perceive, any exceptional circumstances which might have relieved him of his obligation to argue before the IBLA irregularity in BLM's procedure of transmitting pending files to Denver. In his July 5, 1980, letter to the Utah BLM office, Wilson referred to Instruction Memorandum 80–492, which described the fraud investigation to be conducted in Denver and outlined BLM's responsibilities pursuant thereto. Although Wilson states that this Instruction Memorandum was never published in the Federal Register (Reply Brief of Plaintiff-Appellant Harold Wilson at 3), he makes no claim that he was not informed personally of its contents. Absent such a claim and in light of the fact that he did refer to the Memorandum in his correspondence with the Utah BLM office, we must presume that he was informed that copies of pending lease files would be transferred to Denver.

■ Nor does the fact that Wilson raised this contention in his Memorandum in Support of Summary Judgment before the district court somehow substitute for his failure to raise the contention before the IBLA. The district court's standard of review was the same as ours, namely, whether, based on the administrative record, IBLA acted arbitrary or capriciously in affirming BLM's rejection of Wilson's lease offer. The district court did not and could

not conduct a trial *de novo*. No claim was made before the IBLA that the transmittal procedure was irregular. Thus, it was unnecessary for the district court to address the contention. Inasmuch as it appears from the record that Wilson was aware of the allegedly irregular procedure but did not object to it before the agency, we must hold that the contention was waived for purposes of this appeal.

■ Wilson also complains about the substance of the transmittal procedure. He reasons that because Instruction Memorandum 80–492 provided for the transmittal of *copies* of lease files, BLM's transmittal of his *original* file to Denver was, by definition, an "irregular" procedure. He asserts that all the parties simply assumed the original file had been sent to Denver. (Reply Brief of Plaintiff-Appellant Harold Wilson at 3.) It is not clear from the record, however, what the parties assumed on this issue. Nor do we think it is important, inasmuch as Wilson did not argue either before the IBLA or the district court that transmittal of original files to Denver was in violation of Interior's procedural rules as evidenced by the Instruction Memorandum. It is true that Wilson did assert in his district court Memorandum in Support of Summary Judgment that the original files had been sent to Denver (R.Vol. I at 35). However, he in no way equated this assertion with Instruction Memorandum 80–492. Rather, that unsubstantiated assertion appeared at the point in Wilson's Memorandum where he was arguing that mere *transmittal* of files was an irregular procedure. Again, Wilson provides no reason for his failure to present this contention to the IBLA. Absent any showing of "exceptional circumstances" which might have prevented him from raising this argument before the IBLA, we must conclude that it too was waived for purposes of this appeal.

Having concluded that Wilson waived any contentions he may have had as to the nonapplicability of the presumption of administrative regularity, we must determine whether there was a rational basis for Inte-

rior's application of the presumption to the facts of this case. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). In this regard, Wilson argues that the IBLA misapprehended the operation of the presumption. (Brief of Plaintiff-Appellant Harold Wilson at 15.) He maintains that because the IBLA has admitted being " 'troubled' by what kind of evidence operates to 'overcome' the presumption," *id.* at 13, *citing H.S. Rademacher*, 58 IBLA 152, 156–157 (1981), this court should embrace Professor Wigmore's "majority" approach to presumptions and hold that once Wilson came forward with some evidence, the presumption lost all probative force, thereby shifting the burden to Interior to go forward with contrary proof. *Id.* at 15.

■ In effect, what Wilson would have us decide is that an administrative agency commits reversible error if it does not embrace the "majority" view as to the application of presumptions. As the District of Columbia Circuit Court of Appeals has recognized, this simply is not the case:

> The mere fact that the adverse inference rule is widely recognized and followed does not, by itself, demonstrate that the Labor Board commits reversible error when it declines to utilize it. Generally, as the dissent argues, whether to draw the inference is a matter of discretion for the fact finder. Administrative agencies are, of course, required to obey the minimal requirements of rationality and due process. But it does not therefore follow that Wigmore's treatise has been incorporated into the Administrative Procedure Act by reference.

*International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1339 (D.C.Cir.1972) (citations omitted). Thus, even assuming that Professor Wigmore's "bursting bubble" theory of presumptions is the majority approach, we believe there is ample support for Interior's requirement of "clear evidence" to overcome the presumption. *See, e.g., Chemical Foundation, supra*, 272 U.S. at 14–15, 47 S.Ct. at 6 ("[I]n the absence of clear evidence to the contrary, courts presume that public officers have properly dis-

charged their official duties"); *Lewis v. United States*, 279 U.S. 63, 73, 49 S.Ct. 257, 260, 73 L.Ed. 615 (1929) ("[A]ll necessary prerequisites to the validity of official action are presumed to have been complied with, and ... where the contrary is asserted it must be affirmatively shown"). Indeed, even Wigmore concedes there is substantial support for Interior's view that a presumption remains until rebutted by sufficient evidence to the contrary. 9 Wigmore on Evidence, §§ 2493c–2493g. We conclude, therefore, that Interior's requirement that "clear evidence" be introduced in order to rebut the presumption is not erroneous as a matter of law.

■ It remains only to be determined whether Wilson's proof in this case was sufficient to overcome the presumption of regularity. Wilson's proof consisted essentially of (a) the affidavit of the Chairman of FLFC wherein he detailed FLFC's usual business practices and stated that those practices were followed in Wilson's case, (b) FLFC's receipt showing that BLM received a package containing numerous drawing entry cards, and (c) his own documents stating that he had previously submitted the requisite information. Without further corroboration, however, the only conclusion which can be drawn from this evidence is that a certain procedure was usually followed; it does not show that such a procedure was followed in any particular case. *See David F. Owen*, 31 IBLA 2, 28 (1977). Indeed, with facts nearly identical to those in the present case, the IBLA recently concluded that the presumption had not been rebutted. *John Walter Starks*, 55 IBLA 226 (1981). In our view, *Starks* is entirely consistent with the IBLA's holdings that uncorroborated evidence will not rebut the presumption of regularity in lost document cases. *E.g., L.E. Garrison*, 52 IBLA 131 (1981); *Charles J. Babbington*, 36 IBLA 107 (1978); *Owen, supra*. Wilson argues that his "positive" evidence should outweigh the "negative" evidence of the presumption. Although we do not decide that the presumption amounts to "negative" evidence, we believe the IBLA sufficiently addressed this contention in *Owen, supra*, 31 IBLA at

30: "[I]f a document does not arrive in a Government office, how is the government to 'prove' the negative fact of such non-arrival by a preponderance ... of 'direct' and 'affirmative' evidence? Such a burden could rarely, if ever, be supported."

We hold, therefore, that Interior's rejection of Wilson's offer for failure to submit the requisite documents was not arbitrary or capricious.

AFFIRMED.