UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY et al., Defendants,

John E. Moss, member, United States House of Representatives, Intervenor-Defendant.

Civ. A. No. 76–1372.

United States District Court, District of Columbia.

July 30, 1976.

Rex E. Lee, Asst. Atty. Gen., Dept. of Justice; Earl J. Silbert, U. S. Atty. for District of Columbia, Thomas S. Martin, Sp. Asst., Dept. of Justice; David J. Anderson, John T. Boese, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Allan C. Sharrett, Washington, D. C., Executive Asst., AT & T, for defendant.

Howard R. Moskof and Joseph M. Hassett, Hogan & Hartson, Washington, D. C., and Michael R. Lemov, Chief Counsel, Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce, U. S. House of Representatives, Washington, D. C., for intervenor-defendant.

## MEMORANDUM

GASCH, District Judge.

This is an action brought on behalf of the Executive Branch of the United States seeking to restrain the American Telephone & Telegraph Company (hereinafter AT & T) from disclosing to the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, pursuant to a subpoena of that Subcommittee, certain documents, the delivery of which the President has determined "would involve unacceptable risks of disclosure of extremely sensitive foreign intelligence and counterintelligence information and would be detrimental to the national defense and foreign policy of the United States."

On June 22, 1976, the Subcommittee on Oversight and Investigations (hereinafter Subcommittee) voted to issue a subpoena to AT & T. This subpoena was issued by the Chairman of the Interstate and Foreign Commerce Committee on the same date. The subpoena seeks all documents falling within the following categories:

1. Full and complete copies of Federal Bureau of Investigation (FBI) national security request letters, in the possession or control of American Telephone and Telegraph (AT & T) and its 24 operating companies listed below, for access to phone lines handling either verbal or non-verbal communications.

2. Copies of any and all records in the possession or control of AT & T or its operating companies prior to 1969 when written FBI requests were not routinely requested by AT & T and its operating companies.

3. Copies of any and all applicable Bell System Practices (BSP's) describing company policy regarding national security "taps" or "provision of facilities" to law enforcement or intelligence agencies. This should include both current BSP's and any BSP's on the subject which have since been revised or discontinued.

4. Copies of internal memorandum correspondence, board minutes, or other records relative to AT & T, and/or any AT & T operating company, prac-

tice or policy with respect to national security "taps" or "provision of facilities" to law enforcement or intelligence agencies, covering the last 10 years.

The subpoena is directed to AT & T and its chief operating officer. The materials demanded were originally scheduled to be turned over to the Subcommittee on June 28, 1976. Because of ongoing negotiations, the compliance date was extended to July 23, 1976. On July 22, 1976, this suit was filed with the plaintiff seeking a temporary restraining order enjoining AT & T's planned compliance with the subpoena. The parties appeared in open Court. The Chairman of the Subcommittee, Representative Moss, filed a motion to intervene as a party-defendant, which was granted. Counsel were heard including counsel for the intervenor. A temporary restraining order was entered that afternoon by the Court in order to maintain the status quo pending hearing on the motion for preliminary injunction, which was set for July 28, 1976. The Court with the consent of counsel further ordered that the action on the merits be advanced and consolidated with the hearing on preliminary injunction. The plaintiff has moved for summary judgment. The intervenor filed a motion to dismiss or in the alternative for summary judgment.

On the basis of the entire record before the Court and for the reasons to be detailed in this Memorandum, the Court concludes that the plaintiff is entitled to summary judgment and that AT & T should be permanently enjoined from complying with the Subcommittee's subpoena. The following constitute the Court's findings of fact and conclusions of law.

The Executive Branch has in the past and continues to conduct electronic surveillance based upon national security without judicial warrant. The legality of such procedures is not presently before this Court. It is necessary, however, to understand the procedures by which such surveillance is instituted. The affidavit of Robert L. Keuch, Deputy Assistant Attorney General for the Criminal Division of the Department of Justice, details these procedures which are designed to limit the use of such surveillances to appropriate cases. These procedures are as follows: An intelligence agency requesting such electronic surveillance must submit a memorandum to the Director of the Federal Bureau of Investigation, explaining the need for the proposed surveillance. In order to obtain approval, its intent must be either 1) to prevent an actual attack or hostile act of a foreign power; 2) to obtain foreign intelligence information deemed essential to the security of the United States; or 3) to protect the national security information against foreign intelligence activities. The Director, if he approves of the request, forwards the request to the Attorney General. The Attorney General then confers with two Special Assistants to the Attorney General and determines whether the electronic surveillance should be approved.

If approved, the FBI institutes the requested surveillance by hand-delivering, in a secure fashion, to the local office of the telephone company subsidiaries of defendant AT & T, a "national security request letter" which includes the phone number, the address, or some other indication identifying the object of the electronic surveillance. Such a request is necessary because the information intercepted is moved from the point of interception (i. e., the telephone line leading to the object structure) to the point of monitoring (which may be the local FBI office) by way of a leased telephone line, which can be installed only by AT & T and its subsidiaries. It is such "national security request letters" which are sought in paragraph 1 of the subpoena at issue in this case.

Until the late 1960's, records of requests to, or cooperation by, AT & T in national security electronic surveillances were not maintained. However, in the late 1960's AT & T and the Department of Justice entered into negotiations resulting in a form letter, called the national security request letter, which served to reduce to writing and refine the existing policy. Thereafter, beginning in the late 1960's, each

time a national security request for leased lines between the points of interception and the point of monitoring was requested from AT & T or its subsidiaries, a national security request letter was forwarded, which included (1) a request that a leased line be provided at the usual commercial rate, (2) a statement that the request was made upon a specific authorization of the Attorney General for purposes of national security, (3) the phone number, location or other information relating to the lines to be intercepted, and (4) the statement that AT & T was not to disclose the existence of the request because such disclosure could obstruct and impede the investigation.

It is the release of these post-1969 letters that the plaintiff finds most inappropriate, because of the highly sensitive information contained therein. One portion of the letter (called the "To" portion) refers to the local FBI monitoring station which, if it were to become public knowledge, would require the relocation of those stations. However, it is the "From" portion of the request letter which is of crucial importance. An analysis of what is included after the word "From" could identify the subject of the national security surveillance in one of three ways. First, the target of the surveillance may be identified by the listing of the specific telephone number to be intercepted; second, the target of the surveillance may also be identified by the listing of the specific addresses that are to be covered in the surveillance; and third, the target of the surveillance may be identified by the use of technical terms referring to AT & T lines or junction points.

The plaintiff has asserted that the disclosure of these letters or the information contained in them would have extremely serious national security and foreign policy repercussions. First, the information in these letters would disclose the identity of every foreign power, or agent of a foreign power or entity, which is, or which has been, a subject of intelligence interest to the United States. While it may be understood that, as part of its intelligence and counterintelligence activities, the United States conducts such surveillances, public confirmation of this fact would be seriously detrimental to the foreign relations of the United States and would provide those governments whose interests are inimical to the interests of this nation with propaganda and negotiating resources which would be very harmful to our national security.

Second, plaintiff has asserted, publication and disclosure of the telephone numbers included in the request letters would disclose the identities of all those individuals who are, or who have been, the subject of national security electronic surveillance. Under the Executive Branch's announced policy, such electronic surveillances for national security purposes are conducted only when there is reason to believe that an individual is an agent of a foreign power engaged in clandestine activities, including espionage, sabotage, or terrorism. Identification of those individuals who have been subject to surveillance will point out not only the foreign agents that are known, but would be counterintelligence information useful to unfriendly countries or powers because it would indicate those agents who have *not* been identified by United States intelligence agencies.

Moreover, in some instances the individual who is the subject of surveillance is a deep-cover foreign agent whose identity could only come from a very small or select group of sources, and disclosure of the United States' knowledge of the agent's existence or identity would seriously jeopardize the well-being of important agents or the integrity of intelligence sources. In some instances, the lives of source personnel could be jeopardized.

Finally, plaintiff asserts, disclosure of locations which foreign powers are known to be utilizing to conduct business in a secure manner will serve to notify the foreign agents of those unfriendly nations which of their "safe" houses may or may not be used, because it will identify both the "safe" houses of which the United States is aware and those of which it is not aware.

Considering this sensitive nature of the information sought, the Executive Branch

proposed an alternative means of providing the Subcommittee with the information it considered relevant. Under this proposal, following AT & T's preparation of an "inventory" of the request letters held by AT & T, the FBI would identify by date those which were "foreign intelligence surveillances" and those which were "domestic surveillances." In regard to the past domestic surveillances, the FBI would furnish to the Subcommittee the memoranda on which the Attorney General based his authorization for such surveillances, with only minor deletions necessary to protect ongoing investigations. From the "foreign intelligence surveillances," the Subcommittee could select sample items for any two years, and representatives of the Subcommittee would be given access to the memoranda on which the Attorney General based his authorization of those surveillances with names, addresses or other information identifying targets and sources deleted. The President also proposed a procedure whereby verification, and resolution of any questions, would be accomplished by the direct participation of the Attorney General and if necessary by the President himself. This proposal was rejected by Subcommittee Chairman Moss. On July 22, 1976, the President wrote to Representative Harley O. Staggers, Chairman, Committee on Interstate and Foreign Commerce, stating:

> I have determined that compliance with the subpoena would involve unacceptable risks of disclosure of extremely sensitive foreign intelligence and counterintelligence information and would be detrimental to the national defense and foreign policy of the United States and damaging to the national security. Compliance with the Committee's subpoena would, therefore, be contrary to the public interest. Accordingly, I have instructed the American Telephone and Telegraph Company, as an agent of the United States, to respectfully decline to comply with the Committee's subpoena.

Later that day, when it became clear that AT & T would not comply with the President's demand, this action was instituted.

The intervenor, Chairman Moss, ostensibly participating in this action on behalf of the Subcommittee, has taken the position that the Speech or Debate Clause of the Constitution is an absolute bar to judicial interference with a Congressional subpoena issued pursuant to a legitimate legislative investigation. The Speech or Debate Clause in Art. I, Section 6 of the Constitution provides "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place."

The plaintiff has taken the position that this action should be considered one seeking solely to restrain a private entity, AT & T, from releasing documents in its possession. In this way, plaintiff argues, the Court need not consider the applicability of the Speech or Debate Clause, since the immunity of that constitutional provision runs only to members of Congress and their close aides when defending against a lawsuit, and does not afford any protection to a private entity such as AT & T. This argument is advanced so that the Court can avoid dealing with a constitutional confrontation between two of the three branches of our Government. But to take this avenue would be to place form over substance. The effect of any injunction entered by this Court enjoining the release of materials by AT & T to the Subcommittee would have the same effect as if this Court were to quash the Subcommittee's subpoena. In this sense the action is one against the power of the Subcommittee and should be treated as such, assuming that Representative Moss has authority to speak for the Subcommittee.

 The Court is thus faced with a conflict between two substantial and fundamental components of our Constitutional system. On the one hand is the power of the Congress to investigate in aid of the legislative function. See *Barenblatt v. United States*, 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); *Watkins v. United States*, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *McGrain v. Daugherty*, 273 U.S. 135, 174–175, 47 S.Ct.

319, 71 L.Ed. 580 (1927). Moreover, the Supreme Court has written that the policies expressed in the Speech or Debate Clause are designed "to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority." *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 511, 95 S.Ct. 1813, 1825, 44 L.Ed.2d 324 (1975).

On the other hand is the authority of the Executive to invoke the claim of privilege concerning matters of national security, foreign affairs or national defense, where the Executive determines disclosure would be inimical to those interests. The courts have accorded great deference to the Executive's judgment in this area. In *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), dealing with a private claimant's request for evidence in a Tort Claims Act case against the federal government, the Supreme Court stated:

> It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.

345 U.S. at 10, 73 S.Ct. at 533. *See also United States v. Nixon*, 418 U.S. 683, 710–711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *C & S Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

The Court accepts the position of the intervenor that the subpoenaed materials are sought pursuant to a legitimate legislative investigation. Contrary to the intervenor's argument, however, the Court's inquiry cannot conclude at this point. The legislative authority to investigate is not absolute. In our system of government the Constitution is supreme, but no one portion of the Constitution is sacrosanct. Here, the nature, the extent and the relative importance of the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum.

This balancing of the powers and needs of the constituent branches of government has been considered by the courts in somewhat similar circumstances. See *United States v. Reynolds*, 345 U.S. 1, 11, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090 (1974). Such balancing is *not* precluded by the decision in *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). In *Servicemen's Fund* there was no countervailing interest at stake of the magnitude of that involved here. The absolute language used by the Court in *Servicemen's Fund* should be considered in the light of the facts of that case: a private party challenging the Congressional investigatory power. Mr. Justice Marshall in his concurrence in *Servicemen's Fund* (in which he was joined by two other Justices) elaborated on the scope of the *Servicemen's Fund* decision:

> I write today only to emphasize that the Speech or Debate Clause does not entirely immunize a congressional subpoena from challenge by a party not in a position to assert his constitutional rights by refusing to comply with it.
>
> \* \* \* \* \* \*
>
> The Speech or Debate Clause cannot be used to avoid meaningful review of constitutional objections to a subpoena simply because the subpoena is served on a third party. Our prior cases arising under the Speech and Debate Clause indicate only that a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all.

421 U.S. at 513, 516, 95 S.Ct. at 1826–28. In the context of this case, the assertion of Executive privilege is properly before the Court, as this is the only juncture at which it can be considered. It must therefore be weighed against the Legislature's assertion of investigative power.

■ In balancing the competing interests of the Legislature and the Executive, the Court will examine a number of factors. The Court must consider whether the information requested is essential to "the responsible fulfillment of the Committee's functions." *Senate Select Committee v. Nixon*, 162 U.S.App.D.C. 183, 498 F.2d 725, 731 (1974) (concerning a congressional subpoena of Executive documents *not* related to national security). The Court must consider whether there is "an available alternative" which might provide the required information "without forcing a showdown on the claim of privilege." *United States v. Reynolds*, 345 U.S. 1, 11, 73 S.Ct. 528, 534, 97 L.Ed.2d 727 (1953). Finally the Court must consider the circumstances surrounding and the basis for the Presidential assertion of privilege. *Id.; United States v. Nixon*, 418 U.S. 683, 710–11, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Thus the necessity for compelling production must be balanced against the circumstances and grounds for the assertion of the privilege.

■ In the context of this case, and the Court emphasizes that this decision is limited to the circumstances of this case, the Court determines that there are alternative means available for obtaining the information required by the Subcommittee, that the particular form in which that information is sought is not absolutely essential to the legislative function, and that the President's determination that release of this material would present an unacceptable risk of disclosure of matters concerning the national defense, foreign policy and national security outweighs the Subcommittee's showing of necessity.

The primary purpose for which the Subcommittee is seeking this information is to investigate the possibility that federal agencies are conducting *domestic* warrantless wiretaps. The President has offered to provide to the Subcommittee the background material used by the Attorney General in making his determination whether a warrantless wiretap is necessary 1) to prevent an actual attack or hostile act of a foreign power; 2) to obtain foreign intelligence information deemed essential to the security of the United States; or 3) to protect the national security information against foreign intelligence activities. Such material would have deletions of target, source and method information. But it would ostensibly afford the Subcommittee relevant information upon which to determine whether the wiretaps were instituted for foreign intelligence surveillance rather than domestic surveillance and to make the determination as to whether new legislation should be drawn. The helpfulness of the national security request letters in determining the basis on which the wiretaps were instituted is minimal. These form letters would provide 1) the location of the FBI installation used for monitoring the surveillance, and 2) identifying information regarding the surveillance target. While this information may be helpful in verifying the accuracy or completeness of the President's offered release of information, it is not of absolute importance to the Committee's investigation.

■ On the other hand, the President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters. The possible effect of such disclosure has been detailed above. Such a determination by the Executive is generally accorded great deference by the courts. *United States v. Nixon*, 418 U.S. 683, 710–711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528 (1953); *C & S Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Moreover, in this case, if the materials were turned over to the Subcommittee, the information could legally be released upon the majority vote of a quorum (8 members) of the Subcommittee unless such a determination were reversed by the affirmative action of the House. In addition, each of the 435 members of the House of Representatives would have access to such material pursuant to Rule XI(2)(e)(2) of that Chamber's Rules. The potential for disclosure of this highly sensitive informa-

tion, if put into the hands of so many individuals, has been determined by the President to be an unacceptable risk. Such a determination is entitled to great weight.

The Court is not implying that the members of the Subcommittee, or of the House of Representatives, will act negligently or in bad faith if they have access to these documents. But it does appear to the Court that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role in these areas is entrusted. In the areas of national security and foreign policy, that role is given to the Executive.

## ORDER

Upon consideration of the Court's Memorandum entered this day, and the entire record herein, it is by the Court this 30th day of July, 1976,

ORDERED that plaintiff's motion for summary judgment be, and it hereby is, granted; and it is further

ORDERED that intervenor-defendant's motion to dismiss or for summary judgment be, and it hereby is, denied; and it is further

ORDERED that compliance by defendant American Telephone & Telegraph Company, its officers, agents, employees, or anyone acting in active concert or participation with them, and defendants Fox and Sharrett, with the subpoena issued on June 22, 1976 (hereinafter "subpoena") by the Committee on Interstate and Foreign Commerce on behalf of its Subcommittee on Oversight and Investigations, or disclosure of any materials coming within the scope of that subpoena, is, in the facts and circumstances of this case, unlawful and unauthorized without the prior authorization of the Executive Branch of the United States Government; and it is further

ORDERED that the defendants, their officers, agents, and employees, and all those in active concert or participation with them, be and hereby are permanently enjoined from the date hereof from transmitting or otherwise providing to the Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, United States House of Representatives, or any other person, group, or entity, any documents or materials which are or may be determined to come within the scope of the subpoena issued to the defendants on June 22, 1976, without the prior authorization of the Executive Branch of the United States Government.