UNITED STATES of America

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY et al.

Appeal of John E. MOSS, Member, United States House of Representatives.

No. 76–1712.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 2, 1976.

Decided Dec. 30, 1976.

E. Barrett Prettyman, Jr., Washington, D. C., with whom Joseph M. Hassett, Jean

S. Moore and Janet L. McDavid, Washington, D. C., were on the brief for appellant.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Thomas S. Martin, Special Asst. Atty. Gen., Leonard Schaitman and Neil H. Koslowe, Attys., Dept. of Justice, Washington D. C., were on the brief for appellee.

Nathaniel Hawthorne, Washington, D. C., entered an appearance for appellees American Telephone and Telegraph Co., and others.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge.

This unusual case involves a portentous clash between the executive and legislative branches, the executive branch asserting its authority to maintain tight control over information related to our national security, and the legislative branch asserting its authority to gather information necessary for the formulation of new legislation.

In the name of the United States, the Justice Department sued to enjoin the American Telephone and Telegraph Co. (AT&T) from complying with a subpoena of a subcommittee of the House of Representatives issued in the course of an investigation into warrantless "national security" wiretaps. Congressman Moss, chairman of the subcommittee, intervened on behalf of the House, the real defendant in interest since AT&T, while prepared to comply with the subpoena in the absence of a protective court order, has no stake in the controversy beyond knowing whether its legal obligation is to comply with the subpoena or not. The District Court issued the injunction requested by plaintiff and Chairman Moss appeals.

The case presents difficult problems, preliminary questions of jurisdiction and justiciability (application of the political question doctrine) and the ultimate issue on the merits of resolving or balancing the constitutional powers asserted by the legislative and executive branches.

In order to avoid a possibly unnecessary constitutional decision, we suggest the outlines of a possible settlement which may meet the mutual needs of the congressional and executive parties without requiring a judicial resolution of a head-on confrontation, and we remand without decision at this time in order to permit exploration of this solution by the parties, under District Court guidance if needed.

If the parties reach an impasse this will be reported to us by the District Court. We would then be confronted with the need to enter an order disposing of the appeal pending.

## I. BACKGROUND

The controversy arose out of an investigation by the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce. The Subcommittee was interested in determining the nature and extent of warrantless wiretapping in the United States for asserted national security purposes. It was concerned with the possible abuse of that power and its effect on privacy and other interests of U.S. citizens, and with the possible need for limiting legislation.

The warrantless wiretaps which became the focus of this part of the investigation used facilities provided by AT&T upon its receipt from the FBI of "request" letters. Each request letter specified a target line to be tapped, identified by telephone number, address, or other numerical designation. The letter requested a "leased line" to carry the tapped communications from the target location to a designated monitoring station manned by federal agents.

On June 22, 1976, the Subcommittee authorized and the Committee Chairman issued a subpoena requiring the president of AT&T to turn over to the Subcommittee copies of all national security request letters sent to AT&T and its subsidiaries by the FBI as well as records of such taps prior to the time when the practice of sending such letters was initiated. After the sub-

poena was issued, AT&T stood ready to comply.

At this point the White House approached Subcommittee Chairman John Moss in search of an alternative arrangement meeting the Subcommittee's information needs. The basic thrust of the ensuing negotiations between the Subcommittee and the Justice Department was to substitute, for the request letters, expurgated copies of the backup memoranda upon which the Attorney General based his decision to authorize the warrantless taps. These memoranda, providing information on the purpose and nature of the surveillance, might have been more informative to Congress than the request letters, which merely contained numerical identification of the line to be tapped. The Justice Department agreed, at least informally and tentatively, to provide the Subcommittee staff expurgated copies of the backup memo pertaining to foreign intelligence taps, with all information which would identify the target replaced by generic description, such as "Middle Eastern diplomat." The negotiations came close to success, but broke down over the issue of verification by the Subcommittee of the accuracy of the executive's generic descriptions by inspection of a sample of the original memoranda.

The precise details of the negotiations deserve close attention, for they demonstrate the proximity of the parties to a workable compromise. The parties agreed that AT&T would provide the Subcommittee a list of dates of request letters from the FBI. The FBI would then segregate this inventory into two classes: domestic surveillances and foreign intelligence surveillances.[1] The Subcommittee agreed to an initial canvass of two years, selecting 1972 and 1975. For these years, the Subcommittee would be provided with the complete backup memos pertaining to domestic surveillances, with minor deletions only as necessary to shield ongoing investigations of particular sensitivity. The Subcommittee would select a sample of the foreign intelligence surveillances, for which it would have access at the FBI to copies of the backup memoranda, edited to delete identification of the target or sources. These would be identified only generically, including whether or not each was a United States citizen.

All documents were to be taken by the Subcommittee in executive session and kept secure. Under the rules of the House,[2] such material may only be released by vote of the Subcommittee, which may be overruled by a majority of the Committee, which similarly may be overruled by a majority of the full House. Under Rule XI § 2(e)(2) of the House any member of the House may have access to the documents,[3] but may not re-

---

1. The Memoranda of Understanding proposed by the Justice Department on July 12, 1976, J.A. 141, and the Subcommittee on July 20, 1976, J.A. 151, contain identical definitions for this classification.

    Foreign intelligence surveillances are surveillances of the communications of foreign governments, political parties or factions, military forces, agencies or enterprises controlled by such entities or organizations composed of such entities whether or not recognized by the United States, or foreign-based terrorist groups or persons knowingly collaborating with any of the foregoing; domestic surveillance include all other surveillances.

2. Counsel for Congressman Moss asserts without contradiction:

    As reflected in the Affidavit of Congressman Moss, Congress has adopted procedures to protect against disclosure of sensitive information, including that relating to national

security. The subpoena to AT&T was issued in executive session. Under Rule XI(2)(k)(7) of the House of Representatives, "no evidence or testimony taken in executive session may be released or used in public sessions without the consent of the committee." Moreover, a Committee of the House of Representatives can conduct its proceedings in secret, and the House itself may not abrogate the secrecy of the Committee's proceedings, except by suspension of the Rules. IV HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES §§ 4558–4565; see also Rule XI § 2(a), (g).

    Br. for Appellant at 62.

3. Rule XI § 2(e)(2) provides:

    All committee hearings, records, data, charts, and files shall be kept separate and distinct from the congressional office records of the Member serving as chairman of the committee; and such records shall be the

lease any information therefrom except as provided above.

The sticking point in the negotiations came over the means of verifying the accuracy and candor of the classifications and generic descriptions. The Subcommittee proposed that three of its staff members select a subsample of the edited memoranda for verification. These would all be duly cleared for national security trustworthiness. (Two of the three persons designated for this task were formerly with the FBI or CIA.) The staff members would inspect the original memoranda at the FBI, but they would be able to take their notes back to the Subcommittee. The FBI would advise Chairman Moss of the sensitivity of the information in the notes, but the notes would be Subcommittee records subject to Rule XI § 2(e)(2).

The White House, through the Counsel to the President, Philip Buchen, rejected the Subcommittee's proposal. The White House offered to let Chairman Moss, rather than the Subcommittee staff, inspect the subsample of the unedited memos. This, in turn, was rejected by the Subcommittee. President Ford made the final executive offer in a letter to Chairman Moss on July 22, 1976. Its provisions for Subcommittee staff access to the *edited* backup memos at the FBI were the same as those requested by the Subcommittee. But if the staff had questions about the propriety of the classification as "foreign" or about the reasonableness of the generic descriptions of the targets and sources, the Subcommittee would have to raise these questions with the Attorney General. The Attorney General would review the edited and original memos, and either certify the accuracy of the edited version, or provide more information if he found the question well-founded. If the Subcommittee were still dissatisfied, it could appeal for similar review by the President. Thus, under the executive proposal, the Subcommittee could initiate a verification process, but in the end the Subcommittee would have to rely on certification of accuracy by the Executive. Chairman Moss rejected the President's proposal by letter of the same day.

While these negotiations were in progress, the return date of the subpoena had been extended to July 23, 1976. When the negotiations broke down over the verification question on July 22, President Ford instructed AT&T, "as an agent of the United States, to respectfully decline to comply with the Committee subpoena."[4] It appeared, however, that AT&T felt obligated to disregard these instructions and to comply with the subpoena the following day. The Justice Department therefore brought an action in the name of the United States on July 22, and obtained a temporary restraining order prohibiting AT&T from complying with the Subcommittee subpoena. Chairman Moss was allowed to intervene as a defendant. A hearing on the merits of the permanent injunction was consolidated with the hearing on a preliminary injunction set for July 28, 1976. Summary judgment in favor of the Executive was granted on July 30, 1976 and a permanent injunction against AT&T was entered.

property of the House and all Members of the House shall have access thereto.
In his affidavit to the District Court, Congressman Moss stated:
Access to such documents is possible by any Member of the House of Representatives under Rule XI of the Rules of the House of Representatives. Few Members chose to exercise this right, but in any case no copies may be made, no material removed, and nothing can be revealed except by vote of the Subcommittee. Members of the House of Representatives have routinely had access to the most sensitive national secrets including those relating to nuclear weapons, satellite reconnaissance, and all manner of other military secrets. A log is kept of all such Members' access under Rule XI. In addition, a memorandum advising Members of the Subcommittee's procedures in effect regarding such confidential information is furnished to them upon request for access; copy of which is attached hereto as Appendix 1. The Members were likewise advised that I would initiate appropriate proceedings against any person in violation of those procedures.
Moss Affidavit of July 27, 1976 at 2–3, J.A. 116–17.

4. Letter of July 22, 1976, from President Gerald R. Ford to the Honorable Harley O. Staggers at 2, J.A. 164.

The basis of the suit brought by the Justice Department was the Executive's concern over the damage to the national interest from the centralization[5] and possible disclosure outside of Congress, of information identifying the targets of all foreign intelligence surveillances since 1969. It was claimed that public disclosure of these identities would: 1) adversely affect diplomatic relations with countries embarrassed by public disclosure of American tapping of their diplomats, 2) reveal our intelligence and counterintelligence operations and knowledge, both by revealing those agents and locations which are known to the United States and, by inference from the completeness of the request letter inventory, revealing those agents and locations which are unknown, or at least unmonitored, and therefore "safe," and 3) disclose government knowledge of the identity of "deep cover" foreign agents, whose role is known to only a few people, which might reveal our counteragents, eliminating their usefulness and perhaps endangering their lives.

The District Court treated the case as one requiring balancing of conflicting constitutional powers of the legislative and executive branches. It took cognizance that the injunction requested by the plaintiff was equivalent to an order quashing the Committee subpoena, which is generally an impermissible frustration of the congressional power to investigate in an area, conceded by all to be the situation here, in which "legislation could be had." *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 506, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). On the other hand, the District Court considered executive authority to prevent the disclosure of information which could harm the national security, for which it cited the leading case for executive state secret privilege, *United States v. Reynolds,* 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953), as well as other cases touching on executive privilege and executive authority in the area of foreign relations, *United States v. Nixon,* 418 U.S. 683, 710–11, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). The District Court stated it would apply a balancing test. It found that the alternative offered by the president met most of the Subcommittee's information need. The District Court did not make an independent determination of the magnitude of the risk involved in compliance with the subpoena. It deferred to the "final determination" of the President that execution of the subpoena "would involve unacceptable risks of disclosure of extremely sensitive foreign intelligence and counterintelligence information and would be detrimental to the national defense and foreign policy of the United States." *United States v. AT&T and Moss,* 419 F.Supp. 454 at 458, 461 (D.D.C.1976).

## II. SUBJECT MATTER JURISDICTION

■ Initially we examine the jurisdictional basis of this lawsuit. The complaint alleges jurisdiction under 28 U.S.C. § 1345, which gives jurisdiction over suits brought by the United States. Although this suit was brought in the name of the United States against AT&T, AT&T has no inter-

---

5. Prior to 1969, there were no written records (outside the Justice Department) of the initiation of a "national security" wiretap; the FBI contacted orally an appropriate official at the pertinent affiliate of AT&T and told him to arrange the leased line. Since that time, the only written communication by the FBI in connection with each tap has been a request letter hand delivered to the responsible official at the appropriate AT&T affiliate. Thus, until AT&T gathered copies of all the request letters in anticipation of compliance with the subpoena, information identifying targets of "national security" wiretaps has not been comprehensively complied or centralized anywhere outside the Justice Department. This dispersal of the information within AT&T limited access, and the risk of damaging theft or revelation. An analogy might be the watertight compartments of a ship. The Justice Department argues that if AT&T is permitted to comply with the subpoena, centralization of the information both at AT&T and at the Subcommittee will create a much graver danger of complete disclosure.

If a settlement through backup memos of the FBI were achieved, AT&T could redisperse its copies of the request letters. The only centralization of all the target information would be at the FBI, where it has existed all along.

est in this case, except to determine its legal duty. The District Court correctly treated the case as a clash of the powers of the legislative and executive branches of the United States, with AT&T in the role of a stakeholder. A question arises whether a suit is brought "by the United States" within § 1345 when the executive branch is seeking to enjoin the legislative branch. This issue arises in *Clark v. Valeo*, No. 76–1825, (D.C.Cir., *en banc* Jan. 21, 1977).

Other decisions dealing with interbranch conflict have not discussed the problem of jurisdiction, but have nevertheless reached the merits. It seems to be assumed that these cases, dealing with the powers and relations of the branches of the United States, are maintainable in federal court, if justiciable at all.[6] We need not resolve this question for we find subject matter jurisdiction under 28 U.S.C. § 1331.

Jurisdiction exists under 28 U.S.C. § 1331, over cases "aris[ing] under the Constitution, laws, or treaties of the United States," "wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs." This case meets the two prerequisites of § 1331, federal question and jurisdictional amount. The Executive brought the suit claiming that its constitutional powers with respect to national security and foreign affairs included the right to prevent transmission of the request

letters to Congress. The action therefore arises under the Constitution of the United States.

■ Where fundamental constitutional rights are involved, this court has been willing to find satisfaction of the jurisdictional amount requirement for federal question jurisdiction. *See Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 79–80, 518 F.2d 466, 472–73 (1975). The interest asserted by the executive here, protection of our intelligence operations, is clearly an important one. This case does not require us to make a choice between the *per se* approach (important or fundamental, hence worth more than $10,000) exemplified by *Illinois v. City of Milwaukee,* 406 U.S. 91, 98, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) and the financial calculation approach of *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), in which the Third Circuit had found the jurisdictional amount satisfied on the basis of what it would cost plaintiff to reach the military audience by alternative means in the absence of an injunction. The risk envisaged by the Executive is disruption of diplomatic relations and of our intelligence and counterintelligence programs, including possible danger to the lives of counterintelligence sources. It is clear that far more that $10,000 would be required to repair such damage or even as an estimate of the risk that such damage may materialize. We find jurisdiction.[7] P.L. 94–574, § 2, 90 Stat. 2721 (1976).

---

6. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 487 F.2d 700 (1973). In *Kennedy v. Sampson,* 167 U.S.App. D.C. 192, 511 F.2d 430 (1974), an action to compel the Administrator of the General Services Administration to publish a pocket vetoed Act as a validly enacted law, jurisdiction was alleged and proper on the basis of 28 U.S.C. § 1361—mandamus of an officer of the United States.

In *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 366 F.Supp. 51 (D.D.C.1973), Judge Sirica rejected federal question jurisdiction over a suit to enforce a congressional subpoena against the President for lack of allegation of sufficient amount in controversy. That holding was mooted on appeal when Congress passed a special jurisdiction statute which conferred jurisdiction on the District Court for the District of Columbia over cases to enforce subpoenas of the Senate Select

Committee. *See Senate Select Committee on Presidential Campaign Activities v. Nixon,* 162 U.S.App.D.C. 183, 185, 498 F.2d 725, 727 (1974). *See also New York Times v. United States,* 403 U.S. 713, 753, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Harlan, J., dissenting).

7. Since we find the jurisdictional amount satisfied from the point of view of harm to the plaintiff, we need not consider whether it could have been satisfied by considering the effect of a ruling on defendant, 1 Moore's Federal Practice ¶¶ 0.91[1] & 0.96[2]; Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3703.

We are aware that 28 U.S.C. § 1331 was not alleged as the basis for jurisdiction. Although Fed.R.Civ.P. 8(a)(1) requires plaintiffs to make an allegation of the basis asserted for the district court's jurisdiction, courts are not restricted to the statutory basis alleged if the factual allegations fairly support an alternative basis in

## III. QUESTIONS PRESENTED

### A. *Mootness*

Unlike the Senate which is a continuing body, *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927), this House ends with its adjournment on January 3, 1977. Thereupon the subpoena here at issue expires. Of course, AT&T has been permanently enjoined by the District Court both from compliance with the specific subpoena and

> from transmitting or otherwise providing to the Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, United States House of Representatives, or any other person, group, or entity, any documents or materials which are or may be determined to come within the scope of the subpoena issued to the defendants on June 22, 1976, without the prior authorization of the Executive Branch of the United States Government.

*United States v. AT&T and Moss,* 419 F.Supp. 454 (D.D.C.1976). But the question would arise whether any objection to continuance of the injunction after January 3, 1977 would be maintained by an ongoing party.

The case is not now technically moot. However, our present handling of the case, for other reasons, has the advantage of avoiding any question of impending mootness. Whether a controversy will survive will depend on the negotiations we contemplate. It is an additional, if fortuitous, advantage that under our decision, negotia-

tions can be conducted not only by a new House but by a new President.

### B. *Justiciability—Political Question*

In the only previous suit presenting a clash of congressional subpoena power and executive privilege, *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 162 U.S.App.D.C. 183, 498 F.2d 725 (1974), this court reached the merits. In that case Congress sought the assistance of the courts to enforce a subpoena against the President, who claimed an executive privilege based on the need for confidentiality of communications between the President and his advisors. We held that, in light of the fact that the tapes were already in the possession of another congressional committee, the Senate Select Committee's showing of need for the subpoenaed tapes to perform its legislative function was inadequate to overcome the President's claim of confidentiality. *Senate Select Committee* establishes, at a minimum, that the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) resolved an analogous conflict between the executive and judicial branches and stands for the justiciability of such a case.

■ However, the applicability of the political question doctrine depends on the nature of the conflict, the needs and risks on each side, and the availability of judicial standards to apply in making the decision.[8]

a more proper or simple manner. *Sikora v. Brenner,* 126 U.S.App.D.C. 357, 379 F.2d 134 (1967); *New York State Waterways Association v. Diamond,* 469 F.2d 419 (2d Cir. 1972). *See* Wright & Miller, Federal Practice and Procedure: Civil §§ 1206 & 1210; 2A Moore's Federal Practice ¶ 8.07[1].

In view of our conclusion, we have no occasion to consider whether federal jurisdiction could be sustained without any monetary requirement (jurisdictional amount) in view of the recent addition to 28 U.S.C. § 1331(a) of the following:

except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any

officer or employee thereof in his official capacity.

Apart from the issue of retroactive effect (which would be curable by a re-filing), the *issue would arise whether this suit is* "against" the House of Representatives or its Committee, either because of the congressional intervention or on a real party in interest analysis. *See* p. 389, *supra.* There would also be the issue whether such congressional party is an "agency" or "officer . . . in his official capacity" of the United States for purposes of § 1331(a).

8. The criteria for identifying a political question are set out in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). For a sensi-

To decide this case on the merits, we would be called on to balance the constitutional interests raised by the parties, including such factors as the strength of Congress's need for the information in the request letters, the likelihood of a leak of the information in the Subcommittee's hands, and the seriousness of the harm to national security from such a release. The question arises whether judicial intervention is inappropriate, for lack of ascertainable standards, and in recognition of the consideration that a better balance would result in the constitutional sense, however imperfect it might be, if it were struck by political struggle and compromise than by a judicial ruling. These are difficult questions, which we leave open pending further proceedings on remand. We do not now decide whether the answers are mandated by *Senate Select Committee* and *United States v. Nixon.*

### C. *Standing*

■ Congressman Moss was allowed to intervene as a defendant on his own behalf and on behalf of the Committee and the House. *Cf. Gravel v. United States,* 408 U.S. 606, 609 & n. 1, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). On August 26, 1976, the House of Representatives passed H.Res. 1420, authorizing Chairman Moss's intervention on behalf of the Committee and the House and providing $50,000 for outside counsel to provide appropriate representation. 122 Cong.Rec. H9136 (Aug. 26, 1976). Thus, we need not consider the standing of a single member of Congress to advocate his own interest in the congressional subpoena power, *cf. Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 511 F.2d 430 (1974). It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf.

### D. *Clash of Absolutes*

In this case we are faced with patently conflicting assertions of absolute authority. Each branch of government claims that as long as it is exercising its authority for a legitimate purpose, its actions are unreviewable by the courts.

### 1. *Congressional investigatory power*

Congress relies on the Speech or Debate Clause, as interpreted in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) in support of its contention that its subpoena power cannot be impeded by the Executive. *Eastland* held that, even on an allegation of infringement of First Amendment rights, the courts could not interfere with a subpoena concerning a legitimate area of congressional investigation. The immunity from suit provided by the Speech or Debate Clause was not involved in *Senate Select Committee,* for in that case the legislative branch was bringing suit, not being sued, and the suit to aid an investigation presented no "question[ing] in any other Place" of the Speech or Debate of the Congress.[9] Here the court has been asked to interfere with the operation of a congressional subpoena, and the situation is more like *Eastland.*

It may be, however, that the *Eastland* immunity is not absolute in the context of a conflicting constitutional interest asserted by a coordinate branch of the government. This distinction is suggested by the dictum in *United States v. Nixon* that the case might be very different if the President claims a "need to protect military, diplomatic, or sensitive national security secrets . . . ." 418 U.S. at 706, 94 S.Ct. at 3107.

---

tive treatment of the justiciability of disputes over executive privilege between Congress and the President, see Cox, *Executive Privilege,* 122 U.Pa.L.Rev. 1383, 1422–35 (1974). For the view that these disputes are not justiciable, see Note, *The Justiciability of Confrontation: Executive Secrecy & the Political Question Doctrine,* 16 Ariz.L.Rev. 140, 160–62 (1974). For the opposite view, see Dorsen & Shattuck, *Executive Privilege, the Congress, and the Courts,* 35 Ohio St.L.J. 1, 33–40 (1974).

**9.** The Speech or Debate Clause provides that "for any Speech or Debate in either House [Senators and Representatives] shall not be questioned in any other Place." Const. Art. I, § 6, cl. 1.

The *Senate Select Committee* decision had no occasion to consider whether, if the suit were maintainable, defendant could have presented a defense that raised a question of the validity of the investigation.

## 2. *Executive national security power*

The Justice Department claims the President retains ultimate authority to decide what risks to national security are acceptable. Thus, where documents are subpoenaed by Congress, the court's role would be at an end once it determined that there was some risk to national security. At that point, it would have to defer to the President. Although the District Court below purported to engage in balancing and consideration of alternatives, it basically accepted the Executive's assertion of ultimate authority. This appears in the conclusion of Judge Gasch's Memorandum:

> But it does appear to the Court that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role in these areas is entrusted. In the areas of national security and foreign policy, that role is given to the Executive.[10]

Support for judicial deference to executive actions in the area of foreign affairs is found in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) and *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Without deprecating the support given by dicta in these opinions to inherent presidential authority in foreign affairs, we note that the presidential authority was there exercised pursuant to statute, i. e. by the will of Congress. Justice Jackson, concurring in the *Steel Seizure Case*, pointed out:

When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject.[11]

Thus, the cited cases do not establish judicial deference to executive determinations in the area of national security when the result of that deference would be to impede Congress in exercising its legislative powers.[12] The cited cases also invoke the political question doctrine that national security and foreign affairs should be left to the political branches. If we were to invoke that doctrine, we would withdraw from the fray, and the subpoena would go forward without judicial intervention.

### E. *Strength of the Constitutional Interests*

#### 1. *Executive*

The President asserts the power to maintain the secrecy of information pertaining to national security and finds this power inherent in the responsibility given him in article II of the Constitution for foreign and military affairs, hence intelligence and espionage. Of another executive privilege, the Supreme Court said:

Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.[13]

---

**10.** *United States v. AT&T and Moss*, 419 F.Supp. 454 at 461 (D.D.C.1976).

**11.** *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

**12.** Judge Gasch relied on *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), as substantiating judicial deference to the executive "in this area" (*United States v. AT&T and Moss,* 419 F.Supp. 454 at 459) of claim

of "the privilege which protects military and state secrets." (345 U.S. at 7, 73 S.Ct. at 531.) However, the deference in *Reynolds* was in the context of discovery of government documents in a private action under the Tort Claims Act, in which the Court found "the formal claim of privilege set against a dubious showing of necessity." (345 U.S. at 11, 73 S.Ct. at 534.)

**13.** *United States v. Nixon*, 418 U.S. at 711, 94 S.Ct. at 3109.

The constitutional basis, indeed the statutory legality, of the foreign intelligence surveillance underlying this controversy, was explicitly left open by the *Keith* case, *United States v. United States District Court*, 407 U.S. 297, 309 & n.8, 321–22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

There is constitutional power, under the Necessary and Proper Clause,[14] in the federal government to keep national security information secret. This is typically a government power, to be exercised by the legislative and executive branches acting together. The issue in this case is whether and to what extent the inherent constitutional power of the Executive to assure secrecy of sensitive national security information is assertable against Congress. The question requires close attention to the dicta and negative inferences of *Keith, Nixon,* and the foreign affairs cases discussed above.

We leave this question open, by which we mean we leave it where it is, not going beyond what the Supreme Court has said. Such non-accretion by expression of neutrality is what the Supreme Court found Congress had done with respect to the President's national security surveillance powers in § 2511(3) of Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(3). *Keith,* 407 U.S. at 308, 92 S.Ct. 2125, 32 L.Ed.2d 752.

### 2. *Congressional*

Congressional power to investigate and acquire information by subpoena is on a firm constitutional basis, as indicated by *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). In connection with the scope of this power, the Supreme Court stated in *Eastland*:

Although the power to investigate is necessarily broad, it is not unlimited. Its boundaries are defined by its source. . . . We have made it clear, however, that Congress is not invested with a "'general' power to inquire into private affairs." *McGrain v. Daugherty,* 273 U.S. 135, 173, [47 S.Ct. 319, 71 L.Ed. 580] (1927). The subject of any inquiry always must be one "on which legislation could be had." *Id.,* at 177 [47 S.Ct. 319, at 330].

421 U.S. at 504 n.15, 95 S.Ct. at 1822.

It is conceded that in the present instance, the Subcommittee is inquiring into a suitable area of federal legislation—interception of interstate telephone communication. *See* Section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520.[15] Nor is there any allegation that Congress is seeking to "expose for the sake of exposure." *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957).

Also, we are not confronted here by the possibility of a wayward committee acting contrary to the will of the House.[16]

---

**14.** Const. Art. I, § 8, cl. 18.

**15.** *See also Zweibon v. Mitchell,* 170 U.S.App. D.C. 1, 516 F.2d 594 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976), in which we said:

Although it has been suggested that it might be unconstitutional for Congress to restrict any inherent Executive power to engage in warrantless surveillance, see e. g., *United States v. Butenko,* . . ., 494 F.2d at 601 (majority opinion), 611 (Seitz, C. J., concurring in part and dissenting in part) (commenting on majority opinion), we find no reason to infer any such constitutional limitation on congressional power, particularly giv-

en Congress' own powers in the areas of foreign affairs and interstate commerce. *Id.* at 70, 516 F.2d at 663.

**16.** Congressional subpoenas are normally enforced by prosecution for contempt under 2 U.S.C. § 192. Criminal proceedings are begun by a resolution of the full House or Senate, citing the witness for contempt. This plenary vote assures the witness some safeguard against aberrant subcommittee or committee demands. *See Wilson v. United States,* 125 U.S.App.D.C. 153, 369 F.2d 198 (1966).

Although Congress may delegate its investigatory and subpoenaing power to its committees and subcommittees, the assertion of this power against an executive claim of excessive

### F. Balancing by the Courts

A court seeking to balance the legislative and executive interests asserted here would face severe problems in formulating and applying standards. Granted that the subpoenas are clearly within the proper legislative investigatory sphere, it is difficult to "weigh" Congress's need for the request letters. Congress's power to monitor executive actions is implicit in the appropriations power. Here, for instance, if the President has the inherent power claimed to block the subpoena, how is Congress to assure that appropriated funds are not being used for illegal warrantless domestic electronic surveillance?

As to the danger to national security, a court would have to consider the Subcommittee's track record for security, the likelihood of a leak if other members of the House sought access to the material. In addition to this delicate and possibly unseemly determination, the court would have to weigh the effect of a leak on intelligence activities and diplomatic relations. Finally, the court would have to consider the reasonableness of the alternatives offered by the parties and decide which would better reconcile the competing constitutional interests.

## IV. REASONS FOR EXPLORATION OF SETTLEMENT

■ Before moving on to a decision of such nerve-center constitutional questions, we pause to allow for further efforts at a settlement. We think that suggestion is particularly appropriate in this case and may well be productive. The suitability of a judicial suggestion of compromise rather than historic confrontation is indicated by *Nixon v. Sirica*, 159 U.S.App.D.C. 58, 487 F.2d 700 (1973), where we proposed that the counsel and the President consider the possibility of resolving their differences "by procedures other than those set forth in either District Judge Sirica's opinion or the

briefs of the parties." *Id.* at 81, 487 F.2d at 723. In the present case our efforts may be more fruitful. The legislative and executive branches have a long history of settlement of disputes that seemed irreconcilable. There was almost a settlement in 1976. It may well be attainable in 1977.

Furthermore, our own reflections may be of some assistance. As a prelude to settlement conference, it may be helpful if we review pertinent considerations:

1. This dispute between the legislative and executive branches has at least some elements of the political-question doctrine. A court decision selects a victor, and tends thereafter to tilt the scales. A compromise worked out between the branches is most likely to meet their essential needs and the country's constitutional balance.

2. Earlier in 1976, when the parties negotiated extensively and came close to agreement, the focus of negotiations was the FBI backup memoranda. Subcommittee access to edited backup memos, assuming suitable verification, is more likely to satisfy legislative interests than the request letters under subpoena, letters that are both less informative to Congress and involve more risk in the event of disclosure. The letters are really a fall-back source of information for the Subcommittee if it cannot assure suitable verification of the information provided by the executive branch.

3. Since Congress wishes to investigate executive abuse of the warrantless national security wiretap authority claimed by the President, Congress puts it that it should not be required to take the Executive's word for the accuracy of the generic description of the targets in the expurgated backup memos. This has an element of strength. With due recognition of change in context it may not be entirely inappropriate to quote from the Supreme Court's notation in *Keith* of the "historical judgment . . . that unreviewed executive discretion may yield too readily to pressures

risk to national security is clearly stronger when ratified by a similar plenary vote of the House. In this case, H. Res. 1420, passed Aug.

20, 1976, authorized appellant Congressman Moss to intervene on behalf of the interest of the House. *See* Section III C, *supra*.

. . . . " [17] In terms of the *Senate Select Committee* test, Congress may have reason to consider independent verification "critical to the performance of its legislative function." 162 U.S.App.D.C. at 190, 498 F.2d at 732.

4. The President's need is to minimize the risk of disclosure outside of Congress. This problem is magnified if the documents are available to 435 Representatives.

5. The parties came close to reconciling these interests in their near-agreement of July, 1976. The court may be of assistance in avoiding the broad confrontation now tendered, and in facilitating a complete accord, by accepting a structure that includes the availability of the court to resolve relatively narrow issues, through in camera inspection of the back-up memoranda to verify the accuracy of the generic description supplied by the Executive.[18]

6. While in a sense, this course would involve the courts in details of substance, there would be a more typical judicial role, calling for decision on a narrower, more specific issue.

7. In the interest of the nation as a whole, any agreement between the parties should maximize their own procedures for avoiding cross-purpose confrontations.

## V. DISPOSITION

We remand the record to the District Court for further proceedings during which the parties and counsel are requested to attempt to negotiate a settlement. We order the District Court to report to us concerning the progress of these negotiations

within three months of the date of this opinion, unless the executive and congressional parties jointly either ask for an extension or report an earlier impasse.

Without ruling on the merits of the injunction against AT&T's compliance with the subpoena, we leave it in effect pendente lite. We direct the District Court to modify the injunction to exclude request letters pertaining to taps classified by the FBI as domestic, since there was no contention by the Executive, nor finding by the District Court, of undue risk to the national security from transmission of these letters to the Subcommittee.

*Remanded for proceedings not inconsistent with this opinion.*

17. *United States v. United States District Court,* 407 U.S. 297, 317, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972).

18. It would be the function of the parties to propose the structure and its details. This might, e. g., build on the *initial* stages of access contemplated by the parties in their July, 1976 negotiations, by giving a small number of congressional staff investigators, with security clearance satisfactory to the Executive, access to a subsample of unexpurgated backup memoranda. This would provide Congress with some verification that is independent of the Executive. A procedure could be established,

giving added protection to the Executive, with a provision that the notes of the investigators would be held under seal, the contents thereof not be revealed except on a claim by Congress, following discussion with its staff, that there exists a disagreement with the Executive on the accuracy of its classification and generic descriptions. That issue could be tendered to the District Court for a decision. On consideration in camera of the sealed notes of the investigators and the edited and original backup memoranda, the court could issue its decision.